**The STATE of Texas, Petitioner,**

v.

**ACEL DELIVERY SERVICE, INC.,
Respondent.**

No. A–10322.

Supreme Court of Texas.

March 10, 1965.

Rehearing Denied April 21, 1965.

Waggoner Carr, Atty. Gen., Austin, Sam Kelley, Asst. Atty. Gen., for petitioner.

Phinney, Hallman & Pulley, Dallas, for respondent.

NORVELL, Justice.

In the trial court it was stipulated that the defendant (respondent here) Acel Delivery Service, Inc., "had been operating between Dallas and incorporated cities and towns adjacent and contiguous to the City of Dallas and to each other, performing a strictly local service between such contiguous communities as well as what might be termed a local pick-up and delivery service, both picking up and delivering freight

for hire. The communities in which it operates include the cities of Dallas, Grand Prairie, Irving, Mesquite, Garland, Farmers Branch, University Park, Highland Park, Richardson, all of which are incorporated municipalities whose boundaries are contiguous to Dallas, as well as Carrollton, which is contiguous to Farmers Branch, and Arlington, which is contiguous to Grand Prairie, and Fort Worth, which is contiguous to Arlington".

The controlling question in the case is whether or not the motor carrier law requires that Acel procure a certificate [1] from the Railroad Commission. The State of Texas asserts that it does while Acel contends that it is exempt from Railroad Commission control because the definition of "motor carrier" as contained in Article 911b, § 1, subd. (g) does not comprehend its operations. Such definition is as follows:

"The term 'motor carrier' means any person, firm, corporation, company, copartnership, association or joint stock association, and their lessees, receivers or trustees appointed by any Court whatsoever owning, controlling, managing, operating or causing to be operated any motor-propelled vehicle used in transporting property for compensation or hire *over any public highway in this State, where in the course of such transportation a highway between two or more incorporated cities, towns or villages is traversed*; provided, that the term 'motor carrier' as used in this Act *shall not include, and this Act shall not apply to motor vehicles operated exclusively within the incorporated limits of cities or towns*." (We have italicized those portions of subdivision (g) of Article 911b, § 1 upon which Acel places particular emphasis in its arguments.)

---

[1.] In Article 911b, § 1, Vernon's Ann.Civ. Stats., the term "certificate" is defined as meaning a certificate of public convenience and necessity issued under the Motor Carrier Act. The term "permit" means the permit issued to contract carriers under the Act.

The State brought suit to enjoin Acel's operations and enforce statutory penalties, Article 1690b, (b), Vernon's Ann.Pen.Code. The trial court rendered judgment for Acel which was affirmed by the Court of Civil Appeals. 380 S.W.2d 825.

We reverse the judgments of the courts below and remand the cause to the district court for further proceedings consistent with this opinion.

The holdings of the Court of Civil Appeals were in accordance with the arguments which the respondent Acel presents here, namely: 1. The first portion of Article 911b, § 1(g) (above set out) refers to transportation upon a highway between two or more incorporated municipalities. The word "between" as used in the statute means and requires that there be an intervening space of unincorporated territory in order for the Act to have application. It follows that a motor carrier, such as Acel, which at all times operates within the corporate limits of municipalities and traverses no intervening space between municipalities is not comprehended by the Act. 2. The proviso of the subsection uses the plural form—"incorporated limits of cities and towns" and this circumstance reenforces the proposition that as long as a motor carrier operates within the incorporated limits of cities and towns it is not subject to Railroad Commission control.

The growth and development of towns in the Fort Worth-Dallas area is reflected by a stipulation of the parties from which we quote:

"Until about 1953, only the Cities of Highland Park and University Park were contiguous to the City of Dallas. In 1954, other towns began to grow until their boundaries were contiguous with those of the City of Dallas, so that at present the boundaries of Grand Prairie, Irving, Mesquite, Gar-land, Farmers Branch, University Park, Highland Park and Richardson, all of which are incorporated municipalities, are contiguous to Dallas, and the boundaries of the City of Carrollton are contiguous to Farmers Branch, and the boundaries of the City of Arlington are contiguous to the City of Grand Prairie, Texas, and the boundaries of Fort Worth are contiguous to the City of Arlington."

Under respondent's theory of construction of the statutory provision here involved it would have been necessary for a motor carrier to procure a certificate or permit from the Railroad Commission in order to transport commodities from Dallas to Fort Worth prior to 1953, but at present it is no longer necessary to do so by reason of the creation, growth and expansion of the municipalities named in the stipulation, provided, of course, the carrier in operating its vehicles did not traverse some unincorporated area. It is undisputed that a motor vehicle may now travel from Dallas to Fort Worth and remain within incorporated areas for the entire distance.

It is difficult to believe that the Legislature, in 1931 when Article 911b, § 1, Subd. (g) was adopted in its present form,[2] intended that it should have an effect such as this. If we assume that in 1950, for example, there were ten carriers operating between Dallas and Fort Worth under certificates or permits—immediately upon the city limits of Dallas, Fort Worth and the other municipalities in the area becoming contiguous one with the other, so that a vehicle could pass from Dallas to Fort Worth without going outside the limits of some municipality, such ten Railroad Commission regulated carriers would be subject to unlimited and perhaps ruinous competition. Innumerable trucks and conveyances could crowd the highways which would then be city streets[3] and all Railroad

2. See, Acts 1931, 42nd Leg., Reg. Session, ch. 277, p. 480.

3. A city street may be a public highway. See, State v. City of El Paso, 135 Tex. 359, 143 S.W.2d 366 (1940).

Commission control and regulation would abruptly end,—not through any action of the Legislature, but simply by reason of the growth and development of the state and the consequent increase of population in urban areas. Such a result seems wholly out of keeping with the general declaration of policy contained in the Act itself which declares the operating of a motor carrier of property for hire to be a business affected with the public interest and specifically states that there is an imperative need that more stringent regulation be employed, to the end that the highways may be rendered safer for the use of the general public; * * * that congestion of traffic on the highways may be minimized; that the use of the highways for the transportation of property for hire may be restricted to the extent required by the necessity of the general public, and that the various transportation agencies of the State may be adjusted and correlated so that public highways may serve the best interest of the general public. Article 911b, § 22b.

 The situation now existing in the Dallas-Fort Worth area may be duplicated in other sections of the state where contiguous municipalities are in existence or may come into existence and thus, through an increasing urban growth and the expansion of municipal boundaries, a carefully developed system of motor transportation could be destroyed. We would be hesitant to adopt the construction of the statute urged by respondent which would entail such results unless we are compelled to do so by the clear wording of the statute. It may be conceded that a more satisfactory choice of wording could have been made than that actually settled upon by the Legislature in drafting the 1931 amendment, but, nevertheless, it seems reasonably clear that the purpose of amending the Act was to provide for a more stringent regulation of the motor carrier industry.

In approaching the problem of statutory construction the statements of Mr. Justice Holmes (sitting as a Circuit Justice) in Johnson v. United States, 163 F. 30, 18 L.R.A.,N.S., 1194 (1 Cir. 1908) have application here. In rejecting a government contention that schedules in bankruptcy were not "pleadings, discovery or evidence" within the meaning of a statute prohibiting the introduction into evidence in a criminal case of certain pleadings, discovery or evidence obtained in another judicial inquiry, it was said that:

"The government argues that the schedules are not pleadings, discovery, or evidence, and that therefore the section does not apply; but we are not satisfied that the fagot can be taken to pieces and broken stick by stick in this manner so easily. We quite agree that vague arguments as to the spirit of a constitution or statute have little worth. We recognize that courts have been disinclined to extend statutes modifying the common law beyond the direct operation of the words used, and that at times this disinclination has been carried very far. But it seems to us that there may be statutes that need a different treatment. A statute may indicate or require as its justification a change in the policy of the law, although it expresses that change only in the specific cases most likely to occur to the mind. The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed. The major premise of the conclusion expressed in a statute, the change of policy that induces the enactment, may not be set out in terms, but it is not an adequate discharge of duty for courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before."

The Attorney General calls our attention to the history of the Act regulating "for hire" carriers of property. The original Act was House Bill 654, Acts 1929, 41st

Leg., Ch. 314, p. 698, and Section 1(a) thereof contained the following definition:

"The term 'motor carrier' when used in this Act, denotes any person, firm, corporation, copartnership, association, joint stock association, receiver, trustee, or lessee who operated or causes to be operated any motor propelled vehicle (not usually operated on or over rails) over or along the highways or streets of this State for the purpose of carrying or transporting property for compensation or hire between two or more incorporated cities, towns, or villages."

■ Under this definition, a motor carrier to be subject to the Act must transport property for compensation between two municipal corporations. We think it reasonably clear that the 1929 definition comprehended all movements of property and commodities for hire from one incorporated municipality to another, regardless of whether the two municipalities were contiguous or not. In other words, all inter-city traffic was covered by the Act. The definition above quoted, however, rendered the Act patently defective as a regulatory measure in that it did not apply to a carrier transporting property for hire when either the origin or the terminal point of the shipment was situated outside an incorporated municipality. The 1931 amendment of the definition was obviously intended to remedy the defect. This accounts for the wording, "where in the course of such transportation a highway between two or more incorporated cities, towns or villages is traversed." The purpose of this provision was to include carriers whose shipments originated or terminated outside incorporated areas where, in the course of such transportation, a highway between two or more incorporated cities, towns or villages is traversed. It was not the Legislative intention to increase the exemption of the 1929 Act so as to remove from Railroad Commission control those carriers transporting property for hire from one

point within a municipality to a point within a contiguous city, town or village. See, Texas Turnpike Authority v. Shepperd, 154 Tex. 357, 279 S.W.2d 302 (1955). A similar situation exists as to the 1931 proviso relating to "motor vehicles operated exclusively within the incorporated limits of cities or towns." The 1929 Act did not apply to a carrier operating exclusively within the boundaries of a single city or town. It was the purpose of the 1931 amendment to preserve this narrow exemption (effected by definition in the 1929 Act) and not to expand it. The use of the plural rather than the singular form in the proviso is hardly persuasive, unless we first tentatively assume the legality of an operation such as that conducted by the respondent here and seek express wording which would rebut or preclude the assumption. However, the basic premise or supposition runs contrary to the expressed purpose of the motor carrier Act which is to restrict and regulate rather than to expand or create exemptions from the operation of the Act. The legislative contemplation undoubtedly embraced numerous carriers and numerous municipalities, and the use of the plural form in the proviso may be reasonably construed so as to preserve but not expand the 1929 exemption.

We realize that good arguments may be presented in favor of exempting from Railroad Commission regulation those operations which take place wholly within the boundaries of a large city and its satellite towns of the island and enclave classification. However, this is a matter properly left to the Legislative power. We have stated what, in our opinion, is the Legislative intent of the pertinent enactments involved.

We anticipate no difficulty arising between city control of streets and Railroad Commission regulation of carriers because of our construction of the statute before us. Motor carriers must of necessity make use of streets and highways within incor-

porated cities and towns, but there is no question of a conflict of authority between the Railroad Commission and a municipality presented by the record in this case.

The judgments of the Court of Civil Appeals and the District Court are reversed and the cause remanded to the trial court for further proceedings consistent with this opinion.